

George Abarah
8040 E Oak Street
Scottsdale Arizona 85257
4803106026

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CASE NUMBER: CV-10-1539-PHX-DKD

George Abarah,

    Plaintiff,

VS                                                                                         RESPONSE

City of Scottsdale police department, Maricopa county sheriff's office,

    Defendants.


First, it has to be noted that the process server, like the state and officers of the Scottsdale police department, committed perjury by providing false information about when they received the complaint and summons from the plaintiff and filed documents with false information to the court.

It is important to also note that when the Attorney for the city of Scottsdale, claims that police officers acted lawfully in discharging their duties, referring to a certain Rodney King type battery and assault of the plaintiff, withholding and suppressing evidence, a reckless use of force, inhumane treatment and an apparent attempt to kill, choke and strangle to plaintiff to death, who was at his house and unarmed, such is both a false statement and a total disconnect or utter confusion between reality and a fact.

The plaintiff completed graduate studies in the State of Virginia sometime during 2007, 2008 and attempted to dispose of certain property owned within the State of Arizona and relocate to a more conducive environment for facilitating certain international business transactions, all hell broke loose. It has been infringement upon infringement, battery upon battery, assault upon assault, provocation upon provocation, various interferences, disruptions, obstructions and attempts on the plaintiff's life, warrantless invasions and actions by certain elements within the state that could best be described as antitrust activities orchestrated on a personal level.

Any statement that the plaintiff, threatened, assaulted or any other allegation by the city of Scottsdale's attorney is false.

The police department have been suppressing and withholding relevant evidence pertaining to the case about what actually occurred. The plaintiff have been held hostage in state court for the last year and a half further infringing on the plaintiff's liberties. In a year and a half, some two dozen court meetings later, 11 different judges and an innumerable number of state attorneys who have at various point been assigned to the case and all who have a different version of specific information requested by the plaintiff in this case, the case is still in the pre trial conference stage in state court. The state has been deliberately misusing the process to simply abuse, intentionally inflict distress, invade and attempt to interfere and destroy the plaintiff's life, and enable the officers to fabricate false narrations and falsely accuse the plaintiff of an array of bogus charges.

State court was advised there were certain federal questions and issues pertaining to the case which made it more appropriate to he transacted in federal court for various reasons and that a jurisdiction removal be effected to avoid having the state trying to hear cases they are not

sufficiently competent to administer. The level of bias in state court is notorious, is not neutral and sufficiently polluted that certain judges and at some point a public defender that was assigned to the case were working certain schemes to have the plaintiff arrested. The state's various response and behavior, has been one that they have some false impression that they are above the law and that somehow Arizona law is some sort of supreme law of the land.

A certain officer who claimed to experience certain pains in his shoulder after the attempted arrest, based on medical records, had some sort of a broken neck or a neck related injury from a previous car accident and prior to the incident would often complain on the job about experiencing certain neck pains when sitting in front of a computer for some duration. People who are involved in car accidents and who sustain neck related injuries almost often experience referred pains in other areas of the body, specifically, the shoulder and arm. The plaintiff was at some point somewhere within a pile of some 11 police officers who took turns and with apparent delight, kicking, punching, choking, strangling and attempting to suffocate the plaintiff with their KKK mask, with blows felt by some sort of a heavy metal object in various sections of the body. Some other officer claimed that their foot was somewhere within the pile and had some sort of muscle bruise by their fellow officers. The plaintiff at no point whatsoever initiated any contact whatsoever with any of the officers and could not have as these officers were holding the plaintiff's hand throughout the incident. The plaintiff never as much as touched any of them nor has any idea how anybody sustained any injury but for that some officer apparently had a preexisting condition and were all trying to falsely accuse the plaintiff and place him in a false light when they were advised that they utilized excessive force, treated the plaintiff in humanely and would face legal action.

When statements are also made about the plaintiff assaulting anybody or police officers, such is also a false statement. What this case is about is the City of Scottsdale police department, with reckless excessive force, a strange bitterness and bias almost killed the plaintiff while at his house. The plaintiff experienced inhumane treatment during the arrest incident, while held at some facility in Scottsdale for some 12 hours, where some other officer used cuffs to slit the plaintiff's wrist and with blood gushing out, laughed and claimed he loved it. The plaintiff also experienced use of excessive force and inhumane treatment by officers with the Maricopa county Sherriff's office which included certain assaults on the plaintiff while in a wheel chair and in some sort of a hospital, with attempts to freeze the plaintiff to death, coerce at gun point certain activities known to cause an aggravation of certain injuries.

If it was up to the state or the city of Scottsdale, they made similar statements about a certain officer Chong Kim, whose apparent forte was to illegally strip search as many as 15 to 20 women and would threaten them with jail if they did not comply and show him their private part. According to the city of Scottsdale internal affairs department, after numerous complaints against the officer, they saw nothing wrong with that and used similar language as with the plaintiff, that there was no evidence, which as with the plaintiff they have deliberately acted to withhold and suppress. The officer was operating under the so called color of the law. Among his victims a 16 and 19 year old, including a woman who was pulled out of the vehicle from her husband by this officer into the back seat of the police car for the same purpose; she was also threatened to be sent to jail unless she as others, spread her vagina for the officer. We are talking about unfathomable levels of misconduct by city officials who earn a living by consuming tax proceeds. After the city and internal affairs claimed there was nothing wrong with the officer's

conduct, the issue is now with the federal bureau of investigation the officer having admitted these issues some 15 to 20 incidents later.

Like the police officers who confronted the plaintiff at his house, a certain officer Nicholas Young, assaulted some other citizen having forced his way into the person's house and later bragged about teaching this person a lesson by planting their face into the ground, and then falsified reports about what actually happened, claiming also as these officers, resisting arrest and trying to prevent some other entity from using a weapon against an officer. Completely fabricated statements of events that never occurred but to simply cover up misconduct and pin false charges on some other person.

Excessive force, blatant abuse, misuse of process, cover ups, inhumane treatment, rape, murder, and torture has become more of a norm and apparently an institutional culture. Like the plaintiff at some point, people have some false impression that duty of a police officer is to apparently protect the public, not from the plaintiff's experience, they rob, harass, extort, abuse and kill; and if you happen to survive one of such incidents, you may be disabled for life, like a certain troubled unarmed armed who was shot by a city of Scottsdale swat team. He was holding his 3 year old daughter, who fell to the ground and sustained a fractured skull injury. The officers apparently then dragged this person who they just shot assault type weaponry, across the ground over stones ripping apart his flesh to the point where you could see his bones, like some dead meat. This person is now apparently paralyzed and confined to a wheel chair for life. We are talking about a reckless disregard for human life by persons apparent puffed up about a uniform.

The plaintiff sustains the demand for a trial by jury to hold both the Scottsdale police department and the Maricopa county Sherriff's office to account for the various torts against the plaintiff and that the case is assigned to a US district judge.

George Abarah

8/10/2010

http://www.nytimes.com/2009/03/25/nyregion/25perjury.html?_r=1&ref=todayspaper
**When Evidence From Surveillance Cameras Leads to Charges Against Officers**

By CHRISTINE HAUSER
Published: March 25, 2009

Surveillance cameras have captured the faces of criminal suspects in banks, in elevators and on street corners. But they have also surfaced in an unexpected law enforcement role: as evidence against police officers accused of misconduct or of lying on the witness stand.

The latest such case emerged on Monday, when a New York City detective, Debra Eager, 41, was indicted on three felony perjury charges after her testimony before a grand jury about a 2007 drug arrest "starkly contradicted" video surveillance of the event, according to Robert T. Johnson, the Bronx district attorney.

Detective Eager pleaded not guilty to the charges, said her lawyer, Peter E. Brill, who pointed out that she had 15 years' experience on the force and no disciplinary history. He explained the discrepancies between her testimony and the video as honest mistakes.

Mr. Johnson, commenting on the case, said in a statement that "untruthful testimony" from law enforcement officers "strikes at the very heart of our system of justice and seriously erodes public confidence in our courts."

Detective Eager's indictment is one of several in recent months in which video recordings played a role in establishing criminal cases against police officers or led prosecutors to drop charges against suspects the officers had arrested.

In September, the Manhattan district attorney's office dropped charges of attempted assault, resisting arrest and disorderly conduct against a cyclist, Christopher Long, after videotape showed a police officer, Patrick Pogan, knocking him off his bicycle during a cycling event in Manhattan last summer. Mr. Pogan was indicted in December on charges of assault and filing false paperwork, and has since resigned.

In January, two undercover narcotics officers, Officer **Henry Tavarez and Detective Stephen Anderson, were charged with official misconduct and conspiracy after prosecutors said they lied about a "buy and bust" operation at a bar in Queens.** One of the men they had arrested, on charges of selling the officers drugs, produced video evidence showing that the officers had had no contact with him or three other suspects, prosecutors said. The charges against the men were dropped.

Last month, assault charges were dropped against a truck driver, Michael Cephus, after a video showed a police officer, Maurice Harrington, hitting him 10 times with a metal baton on Delancey Street in Manhattan, according to Brian Orlow, a lawyer for Mr. Cephus.

Alicia Maxey Greene, a spokeswoman for the Manhattan district attorney's office, confirmed

that the office was investigating Officer Harrington, but declined to comment further.

Also last month, **Officer David London was indicted on charges of assault and filing false records after video from a surveillance camera at an Upper West Side building showed that he pulled a man he had accused of resisting arrest out of an elevator and beat him 18 to 20 times with a baton.** Officer London has pleaded not guilty.

Detective Eager was released on a $15,000 personal recognizance bond, and her case was adjourned until May 12. Each of the three counts carries a maximum sentence of seven years in prison, prosecutors said.

Mr. Brill said Detective Eager had no incentive to lie. "What did she have invested in lying?" he said on Tuesday, recounting his remarks in court the day before. "She has made 1,300 arrests."

The chief spokesman for the Police Department, Paul J. Browne, declined to comment on Detective Eager's case other than to say that she had been suspended from the force. But when asked to comment about police officers accused of perjury, he said, "It does not happen often, but when it does, it is baffling why police officers would risk prosecution and their careers to advance a criminal case rather than let the chips fall where they may."

The case against Detective Eager stems from her arrest of three people on drug charges in November 2007 at an apartment building on Holland Avenue in the Bronx.

In an excerpt from her grand jury testimony, released by Mr. Johnson's office, Detective Eager says she and a partner left their van and entered the building through a broken door to follow two men who they believed had two boxes of marijuana. In another excerpt, she says she and her partner "went up to the fourth floor" and then "to the fifth floor" when they heard the suspects jingling keys to unlock Apartment 55N.

The third perjury count was based on her remarks that during the arrest she had recovered two boxes of marijuana, one 15 pounds and the other 18 pounds.

The district attorney's statement does not say what the video showed, but claims that her testimony was "specific in detail" and contradicted by the video surveillance.

The felony and misdemeanor charges were dropped against the drug suspects last October, prosecutors said.

Mr. Brill said the surveillance video became part of the case when one or more of the defendants filed a complaint against Detective Eager with the Civilian Complaint Review Board.

**Mr. Brill said that after Detective Eager saw the video, she realized that "some of the things she said in the grand jury were incorrect** based upon not lying, but mistakes she had made in recalling this."

Within days, he said, she went to the district attorney's office and explained the situation.

Mr. Brill said the video showed that Detective Eager and her partner had gone up to the fifth floor separately, perhaps minutes apart, and that members of the police team she was with made the recovery of the boxes — she did not recover them on her own.

John Eligon and Mathew R. Warren contributed reporting.


http://www.azcentral.com/news/articles/2009/08/21/20090821sr-young0822.html
by Ofelia Madrid - Aug. 21, 2009 10:12 AM
The Arizona Republic

Read more: http://www.azcentral.com/news/articles/2009/08/21/20090821sr-young0822.html#ixzz0pWtaQaxh

The Arizona Peace Officer Standards and Training Board on Wednesday revoked the badge of a former Scottsdale police officer who bragged about having taught a suspect a lesson by "face planting" him to the ground after forcing his way into the suspect's home.

Nicholas A. Young lost his Arizona peace-officer certification, which means he can no longer work as an officer in Arizona.

According to Scottsdale police internal affairs documents obtained by The Arizona Republic, allegations of unlawful/improper entry, poor judgment, failure to report and integrity violation were made against Officer Young.

According to the documents, in August 2008, Young responded to a shoplifting call. He went to the home of the suspect and was invited in. A short time later, the suspect asked Young to leave. Young left, but continued to question the suspect outside the front door.

The suspect demanded Young leave and began to close his front door. Young forced the door open with either his arm or shoulder, re-entered the home and chased down the subject and forced him to the floor, the documents said.

Young told internal-affairs investigators in November that he was trying to prevent the suspect from using a weapon against him. But the report states that Young used poor judgment by not requesting a back-up officer, which is department protocol. Young also failed to document his actions and tell his supervisor how he entered the home. Young also sent typed messages to a department call taker where he bragged about having taught the suspect a lesson by "face planting" him to the ground.

When Young was interviewed by investigators in November, he said that he'd told his supervisor about how he'd entered the home. His supervisor testified that she wasn't told.

Interviewed in January, when he was presented with the contradiction, Young admitted that he

had lied in his previous interview by saying that he'd informed his supervisor of how he entered the home and misled his supervisor.

Young resigned from the Scottsdale Police Department in February.

Read more: http://www.azcentral.com/news/articles/2009/08/21/20090821sr-young0822.html#ixzz0pWtMeqnm


Ex-Officer's Strip Search Tactics Questioned
Chong Kim Accused Of Illegally Strip Searching 15 To 20 Women
Donna Rossi
Reporter, KPHO.com

POSTED: 6:15 pm MST November 23, 2009
UPDATED: 3:06 pm MST November 24, 2009
http://www.kpho.com/video/21707311/index.html
http://www.kpho.com/news/21705177/detail.html


SCOTTSDALE, Ariz. -- Newly obtained documents reveal a former Scottsdale police officer may have illegally strip searched as many as 20 Valley women during his two years on the force.

**"Chong Kim resigned in June 2008 amid allegations he threatened to arrest and jail a 19-year-old woman unless she stripped and showed him her private areas."**

When that complaint was made public, Scottsdale police admitted they had received a similar complaint against Kim in 2007. Internal Affairs investigated that complaint and exonerated Kim based on a lack of evidence.

In a summary of the internal affairs report from 2008, investigators noted that Kim admitted lying to them when first confronted with the accusations.

Kim then told investigators he coerced both of his accusers to show him their breasts and undergarments or face going to jail, the report said.

Kim also said that he searched females inappropriately an estimated 15 to 20 times during his approximately two years as a police officer, the report said.

**In one instance, Kim admitted to using his tactics on a 16-year-old girl involved in a family fight, according to the report.**

**In another situation, Kim described how he pulled over a couple in a car, the report said. Kim told investigators he put the driver's wife in the back of his patrol car for the sole purpose of getting her to expose herself to him, the report said.**

Scottsdale police said they looked into Kim's confessions but were unable to locate any additional victims.

A police spokesman said the department also investigated possible criminal charges against Kim, but determine he did not violate any state laws.

"Clearly this was an officer who was going way beyond his job description," said Ulises Ferragut, a defense attorney who has been involved in similar cases.

The Maricopa County Attorney's office confirmed a case against Kim was never sent to their office. Public records obtained Tuesday show Kim was placed on the Brady List -- a list of officers with credibility issues.

Scottsdale police confirmed they turned the investigation over to the FBI. The U. S. Department of Justice's civil rights division confirmed it has an open criminal investigation into this case.

Last week, the Scottsdale city council approved a $315,000 payout to settle a civil lawsuit filed by the 19-year-old victim from June 2008.


http://scottsdalepoliceshooting.org/
The Shooting.

David walked outside the house and asked officers to back up. He wanted to go to his Dad. He wanted to go to the street to see his family, not knowing the family had been held in seclusion by Scottsdale Police. Four officers, staged immediately outside the front door, took a couple of steps back to give David some space.

Arizona police officers are trained to safely resolve problems with people in mental crisis by assigning one person to calmly speak with the patient. Instead of following training, police yelled at David. He was given opposing commands to put up his hands, put down the baby. He was not told he was under arrest. Confused by the contradictory orders, David raised his daughter up over his head and began to walk to the street. He wanted to be with his family. David and the police negotiators wanted a peaceful resolution. As he walked to the street an officer armed with a military assault rifle yelled at him. From across the street another officer armed with an assault rifle joined in the chorus of shouts. David turned to go back to the safety of the home.

The two officers fired their military assault rifles striking David down after he took 3 to 4 steps back towards the home. He was immediately paralyzed and fell forward. David lost his grip on his daughter and she flew down hitting her head on the concrete front walkway. Police, unbelievably, then DRAGGED David's paralyzed body hundreds of yards over rocks and gravel, ripping through his skin, exposing bone.

Caught On Tape.

Police were unaware for almost two hours after the shooting that the family's neighbor had videotaped the entire event, including David's attempt at surrender, and the shooting. There was no blood inside the house. There was no blood on the front of David's shirt. His daughter was not bleeding from either of her ears. But because police told the hospital and Child Protective Services that the little girl was bleeding before David was shot, the little girl was subjected to full body scanning. That proved police fabricated their story. There was no evidence of abuse.

http://www.azcentral.com/news/articles/2009/11/13/20091113sr-lawsuit1114.html
**Family of man shot, paralyzed by police files $40M lawsuit**
Ofelia Madrid - Nov. 13, 2009 04:57 PM
The Arizona Republic

The family of a man shot and paralyzed last year by Scottsdale police filed a $40 million lawsuit against the city, 18 police officers and a dispatcher.

Attorneys for David Hulstedt argue that Scottsdale police used excessive force when two SWAT team officers shot Hulstedt in the lower torso, leaving him paralyzed from the waist down after a barricade situation.

"The two shooters had no cause to shoot this unarmed man in the back without warning or even telling him he was under arrest," said Alan Simpson, an attorney representing the Hulstedt family.


**Trio says woman was raped by Logan deputies, Chapmanville officer**
**10/13/2009 12:53 PM By Kelly Holleran -Kanawha Bureau**

CHARLESTON -- Two anonymous Logan County men and an unidentified woman claim the woman was raped by three intoxicated Logan County sheriff's deputies and a Chapmanville police officer after leaving a Logan bar.

The Logan residents, identified only as Jane Doe, John Doe 1 and John Doe 2, filed a lawsuit Sept. 6 in U.S. District Court for the Southern District of West Virginia against Logan County Sheriff's Department, Logan County Sheriff Eddie Hunter, three unknown Logan County Sheriff's deputies, the city of Chapmanville, the Chapmanville Police Department and an unidentified Chapmanville police officer.

According to the lawsuit, Jane Doe, John Doe 1 and John Doe 2 left the Glitter Girls show bar in Logan at about 3 a.m. on Sept. 7, 2008. Jane Doe and John Doe 2 proceeded to climb into a car parked in the bar's parking lot with Jane Doe entering on the driver's side, while John Doe 1 walked away from the car and up the street, the suit states.

As John Doe 1 walked under an underpass near the bar, he was approached by three Logan County sheriff's deputies and by the Chapmanville officer, who allegedly were all intoxicated

and asked John Doe 1 of the whereabouts of Jane Doe, the complaint says.

After telling the officers that Jane Doe was across the streets, John Doe 1 claims he was frisked by the police and his wallet was allegedly emptied.

Leaving John Doe 1, the four officers went across the street where they approached Jane Doe and John Doe 2 and administered field sobriety tests on Jane Doe, all of which she failed, according to the complaint.

"The deputy officer defendants intimidated, assaulted and threatened John Doe 2, emptied his wallet; and ordered John Doe 2 to drive John Doe 1 home or 'they (the deputy officer defendants) would kill both of them,'" the suit states.

Logan County sheriff's deputies proceeded to shove Jane Doe into the back of their cruiser without informing her if she was under arrest, the complaint says. They then drove up Route 44 toward Switzer while forcing Jane Doe to drink more alcohol and while one of the officers sexually assaulted Jane Doe, she claims.

"When Jane Doe resisted these advances, she was physically grabbed and held down, and told that 'she was getting off easy because she could have been arrested for driving under the influence,'" the complaint says.

When they arrived outside Switzer, the officers stopped the patrol car on a dirt road, took Jane Doe from the backseat and shoved her onto the hood of their car.

"Three of the four deputy officer defendants proceeded to rape Jane Doe," the suit states. "The fourth deputy officer defendant remained in the patrol car; sick, vomiting, and intoxicated."

After they were done sexually assaulting Jane Doe, the officers intended to take her home when they saw John Doe 1 and John Doe 2 in a church parking lot, according to the complaint. So, the officers dropped Jane Doe off 50 feet from the church parking lot, the complaint says.

John Does 1 and 2 convinced Jane Doe to go to Logan Regional Hospital, and she was later transferred to Charleston Area Medical Center, the suit states.

**"Unprovoked and unjustified attacks and assaults on innocent civilians by law enforcement officers are intolerable in a civilized society," the suit states. "As such these deputy officer defendants' unprovoked and unjustified attacks and assaults on Jane Doe, John Doe 2, and John Doe 1 were atrocious, intolerable, and so extreme and outrageous that it exceeded the bounds of decency."**

Jane Doe and John Does 1 and 2 claim the officers' conduct was a violation of their constitutional rights. Because of the officers' actions, the plaintiffs claim they sustained physical injuries, severe emotional distress, embarrassment, mental anguish and economic loss, including medical expenses and lost income.

In addition, Jane Doe suffered embarrassment because of the incident, according to the complaint.

In the 12-count suit, the plaintiffs are seeking compensatory and punitive damages, plus attorneys' fees, costs and other relief the court deems just.

Richard D. Lindsay II, Matthew C. Lindsay and Richard D. Lindsay of Tabor, Lindsay and Associates in Charleston will be representing them.

U.S. District Court case number: 2:09-cv-990